## IRON SILVER MINING COMPANY v. CAMPBELL.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 22. Argued March 25, 26, 1890. — Decided April 28, 1890.

A lode patent, issued subsequently to the issue of a placer patent of a tract within whose metes and bounds the lode patent is located, is not conclusive evidence that the lode was so known at the time of the issue of the placer patent as to authorize the issue of the lode patent.

Where two parties have patents for the same tract of land, and the question in a judicial proceeding is as to the superiority of title under those patents, and the decision depends upon extrinsic facts not shown by the patents, it is competent to establish it by proof of those facts.

The provisions in Rev. Stat. §§ 2325, 2326, as to adverse claims to a lode, for which a patent is asked, do not apply to a person who, before the publication first required, had himself gone through all the regular proceedings required to obtain a patent for mineral land from the United States; had established his right to the land claimed by him; and had received his patent therefor.

THE case is stated in the opinion.

*Mr. Ashley Pond* and *Mr. L. S. Dixon* for plaintiff in error.

*Mr. T. M. Patterson* (with whom was *Mr. C. S. Thomas* on the brief) for defendants in error.

MR. JUSTICE MILLER delivered the opinion of the court.

This is a writ of error to the Circuit Court of the United States for the District of Colorado. The action was brought in that court by Peter Campbell *et al.*, plaintiffs, against The Iron Silver Mining Company, defendant, and was in the nature of an ejectment to recover possession of a mineral lode called The Sierra Nevada lode mining claim. The pleadings merely set up that the plaintiffs were the owners of said lode or claim, describing it, and that defendants had intruded upon their possession. The defendants denied that plaintiffs were the owners of the claim, and asserted their own title. The case was submitted to the court without a jury. The court made the following finding of facts and conclusions of law on which it rendered a judgment for the plaintiffs:

"This cause coming on for trial before the court, and the parties appearing by their attorneys, and having, in open court and by their stipulation in writing filed with the clerk, waived a trial by jury, and the court, having duly heard and considered the evidence, oral and documentary, offered by the respective parties, and having duly deliberated thereon, finds the following facts and conclusions of law, viz.:

"That the defendant, The Iron Silver Mining Company, is a corporation created and organized and existing under and by virtue of the laws of the State of New York, and has complied with the laws of the State of Colorado, so as to entitle it to do business and sue and be sued in the State of Colorado.

"That the mining ground and property described in the pleadings in this action were a part of the public domain of the United States until the title thereof passed out of the United States by the issuing of patents, as hereinafter set forth.

"That the said patent of the Sierra Nevada lode mining

claim was issued to the said plaintiffs and their grantors and predecessors in interest at the time thereto stated, and by duly executed and recorded deeds of conveyance the title to the land mentioned and described in the said patent and the complaint in this action has been conveyed to and is seized, owned and possessed by the said plaintiffs, and was so seized, owned and possessed by them at the time of the commencement of this action.

"That on the 13th day of November, 1878, said William Moyer duly made application in the proper United States land office to be allowed to enter and pay for a patent for said William Moyer placer mining claim, being survey lot No. 300 and mineral entry No. —; that on the 21st day of February, 1879, said William Moyer was allowed to and did make entry in said land office of the United States and paid for the said placer claim, and that on the 30th day of January, 1880, the said William Moyer placer patent was issued to the said William Moyer for the tract of land described in said placer patent, and that by virtue of duly executed and recorded deeds of conveyance the said defendant company has become the owner of and seized of all the right, title and interest in and to the said tract of land described in and conveyed by the said placer patent.

"That the ground described in said patent of plaintiffs for the said Sierra Nevada lode claim is principally located or situated within the exterior boundaries of the tract of land described in said placer patent for the said William Moyer placer claim and is a part of the same land, and the maps introduced in evidence and contained in the bill of exceptions and record correctly delineate the surface of the ground comprised within the exterior boundary lines of the said placer patent and the said lode patent, respectively.

"And the court finds as conclusions of law from the foregoing findings of fact, that it is conclusively presumed and found, from the face of said Sierra Nevada lode patent, that the said Sierra Nevada lode claim had been duly discovered, located, and recorded, and owned by the said patentees in said Sierra Nevada lode patent and their predecessors in interest, (the

said plaintiffs,) within the exterior boundaries of the said tract of land described in said William Moyer placer patent, before the time of the said application for the said placer patent, and the mining ground described in the said complaint and conveyed by the said lode patent is excepted out of the grant of the land described in and conveyed by the said placer patent.

" And the court finds that the plaintiffs were, at the time of the commencement of this action, and still are, the owners and seized of said tract of land described in said complaint and called the Sierra Nevada lode mining claim ; that the said defendant company wrongfully withheld, and still does wrongfully withhold, the possession thereof from the said plaintiffs.

" It is, therefore, ordered and adjudged that the plaintiffs have judgment against said defendant company for possession of the mining ground in dispute, as described in the complaint herein, with costs, to be taxed.

" And forasmuch as the matters and things above herein set forth do not appear of record, and the said defendant tenders this its bill of exceptions, and prays that the same may be signed and sealed by the judge of this court, and pursuant to the statutes in such case made and provided, which is accordingly done, this 8th day of July, 1885, being one of the judicial days of the May term of the said court, A.D. 1885, at the city of Denver, in said district.

"(S'g'd) .   Moses Hallett, *Dis't Judge.*"

This finding of facts and conclusions of law is embodied in and made a part of a bill of exceptions. We think the correct practice in cases submitted to a court without a jury is for the court to make its finding of facts and its conclusions of law a separate paper from pleadings or bills of exceptions.

The only thing of any consequence in the bill of exceptions, containing a considerable amount of oral testimony, almost every word of which is objected to by one party or the other, is the two patents under which the adverse parties claim title. From this and the finding of facts it appears that the patent under which the Iron Silver Mining Company claims was issued to William Moyer on his application, made in the proper

land office on the 13th of November, 1878, and bears date January 30, 1880; and that the one under which plaintiffs below claim bears date March 15, 1883. It is conceded that both patents cover the land in controversy. The Moyer patent, being the elder, is for fifty-six acres of placer mining land. The plaintiffs' patent, though of a later date, is for a vein or lode of mineral deposit which runs under the surface of the ground covered by defendant's patent.

The conclusion of law which controlled the judgment of the Circuit Court in the present case is that "it is conclusively presumed and found, from the face of the said Sierra Nevada lode patent, that the said Sierra Nevada lode claim had been duly discovered, located and recorded, and owned by the said patentees in the said Sierra Nevada lode patent and their predecessors in interest, the said plaintiffs, within the exterior boundaries of said tract of land described in said William Moyer placer patent, before the time of the said application for the said placer patent, and the mining ground described in the said complaint and conveyed by the said lode patent is excepted out of the grant of the land described in and conveyed by the said placer patent." It is the soundness of this conclusion of law from the facts found which we are called upon to review.

The real principle on which the plaintiffs relied to establish the superiority of their claim for the lode in controversy is, that it was a known lode, within the meaning of the act of Congress on that subject, at the time of the application for the Moyer patent, and therefore, by the act of Congress on that subject, the title to it did not pass to the grantee in that patent. If the fact were proved that the Sierra Nevada lode was a known lode, within the limits of the placer patent obtained by Moyer, at the time of his application, the contention of the plaintiffs is sound. But notwithstanding nearly all the testimony, particularly all the oral testimony found in the bill of exceptions, was introduced for the purpose of proving the existence of this lode, and that it was known to Moyer or his grantor, and in refutation of that proposition, the court in its finding of facts makes no finding on that subject. It was

obviously the opinion of the court, and it is the ground on which defendants in error support its judgment here, that the patent issued by the government is conclusive evidence that such vein was known so as to authorize the land department to issue a patent for it as being reserved out of the grant in Moyer's patent.

It is very singular that the patent to Campbell and others for the Sierra Nevada claim makes no reference to this reservation in Moyer's patent, and no statement that the existence of the lode was known to anybody at the time the Moyer patent was applied for or when it was granted. There is nothing on the face of this patent to show that there was any contest before the land department on this question of the existence of the vein, and the knowledge of it on which the validity of the patent is now supposed to rest. We have, therefore, the junior patent, which is held to defeat the prior patent, with no reference to any contest between the different claimants before the land office, and we have the court, in deciding the present case, while hearing the testimony which would defeat or sustain that patent, utterly ignoring it, and making no finding upon the subject which the defendants in error believe to be involved in the issue.

The reason of this action by the court is very plain. It proceeds upon the idea that it is conclusively presumed and found, from the face of the Sierra Nevada lode patent, that the said lode claim had been duly discovered, located and recorded within the exterior boundaries of the land described in the said Moyer placer patent before the application for the said Moyer patent. As there is not a word said on the face of the Sierra Nevada lode patent on this subject, we must look for some inference of law, rather than to the statement of facts, upon which this presumption conclusively arises.

That presumption of law, as explained by counsel, is that, since the law under which the Moyer patent issued reserved from its operation any known vein or lode within the exterior boundaries, it is presumed that, when the officers of the land department issued the patent for the Sierra Nevada lode, they made such inquiries into the question of the existence of this

lode, and its being known to the grantee in the Moyer patent, as authorized it to decide that question; and that that decision is binding and conclusive forever upon all parties. We are not able to agree with this statement of the law.

The proceedings in the land department for securing title to government lands are usually *ex parte*. There is no general provision of law which requires a party who can make the necessary proofs, which on their face entitle him to purchase land from the government, to call any individual as a contestant, or to notify other parties interested in the matter that he is about to proceed. Each one proceeds in his own manner, and establishes his own claim, and the officers of the government frequently do not know that there is any other party claiming the same land, while there may be such a party who has also taken proper steps, and whose rights are superior to those of the party presenting himself before the officers of the government. It is this *ex parte* proceeding which is supposed to bind the claimants under the Moyer patent conclusively and forever in regard to their knowledge of the existence of this Sierra Nevada lode at the time they made application for their patent within its limits.

We are not ignorant of the many decisions by which it has been held that the rulings of the land officers in regard to the facts on which patents for land are issued are decisive in actions at law, and that such patents can only be impeached in regard to those facts by a suit in chancery brought to set the grant aside. But those are cases in which no prior patent had been issued for the same land, and where the party contesting the patent had no evidence of a superior legal title, but was compelled to rely on the equity growing out of frauds and mistakes in issuing the patent to his opponent.

Where each party has a patent from the government, and the question is as to the superiority of the title under those patents, if this depends upon extrinsic facts not shown by the patents themselves, we think it is competent, in any judicial proceeding where this question of superiority of title arises, to establish it by proof of these facts. We do not believe that the government of the United States, having

issued a patent, can, by the authority of its own officers, invalidate that patent by the issuing of a second one for the same property.    If it be said that the question of the reservation of this vein as a known lode under the law on that subject makes a difference in this respect, and that the land office has a right to inquire whether such lode existed, and whether its existence was known to the patentee of the first patent, we answer that a patent, issued under such circumstances to the claimant of the lode claim, may possibly be such *prima facie* evidence of the facts named as will place the parties in a condition to contest the question in a court.

But we are of opinion that it is always and ultimately a question of judicial cognizance.    The first patent conferred upon Moyer the right to this vein and to all other veins within the limits of his fifty acres of placer claim.    There is excepted from that grant any lode existing and known at the time application was made for his patent.    Whether such a lode did exist, and whether it was known to him, is a question which he has a right to have tried by a court of justice, and from which he cannot be excluded by the subsequent action of the officers of the land department.    It is not necessary to consider whether there may not be reservations of a character which could be thus disposed of by the proper land offices; for instance, a reservation of any land heretofore patented or granted to other parties.    There is nothing there to decide but to look at the records of the land office and see whether any land within that boundary ever had been granted.    A reservation of a specific boundary, laid down so as to be identified, in the first patent, needs no judicial action to determine what it is that is reserved.

But in the present case, two facts requiring judgment, discretion, knowledge of the law and the balancing of testimony, are essential to the exercise of the right to grant the property to some other party.    One of these, the existence of such a vein, is a question often of great conflict of evidence, requiring the weighing of testimony.    The other, the most important of all, the most difficult to decide, the least likely to be decided correctly by *ex parte* testimony or in *ex parte* proceedings, is

the question whether, if such mine existed, it was known to the party who applied for the patent at the time application was made. And while we are not prepared to say at this time that the land officers cannot, on a *prima facie* case, decide the right of the applicant to such vein and give him a patent for it, we are satisfied that in any conflict between the title conferred by two patents, whether it be in law or in equity, the holder of the title under the elder patent has a right to require that the existence of the lode, and the knowledge of its existence on the part of the grantee of the elder patent, should be established. Here we have a remarkable fact, the absence of any evidence of a contest before the land department on that subject, and of any hearing on the part of the owner of the elder title. We have no finding or assertion of the existence of such fact in the junior patent, or that it was established even by *ex parte* proceedings before the officers of the government; and the introduction of evidence, on the trial in this case, on that subject, was ignored as any part of the case on which the judgment of the court was based. It rests solely, and as the court says, conclusively, on the presumption that the officers of the government did their duty in the matter, and that what they decided is incapable of contradiction.

The case in this court bearing the nearest analogy to the one before us is that of *Railroad Co.* v. *Smith*, 9 Wall. 95, 99. By the act of September 28, 1850, all the swamp and overflowed lands belonging to the United States were given to the States within which they lay. The Secretary of the Interior was directed by the statute to ascertain and distinguish these lands and certify them to the several States, and it has been repeatedly held by this court that the act itself was a present grant of all such lands. Congress subsequently, by the act of June 10, 1852, granted the right of way and a portion of the public lands to the State of Missouri, in aid of the construction of railroads. This grant was accepted by the legislature of Missouri, which, by a statute, vested the land granted in the Hannibal and St. Joseph Railroad Company, the company having located its road, whereby the even-numbered sections

and quarter sections granted to the State for the use of said road were ascertained. The railroad company, finding Smith, the defendant, residing upon and claiming one of these quarter sections, brought an action of ejectment to recover possession. Smith defended on the ground that the land was swamp land, and the title passed from the United States by the act of 1850, and could not be granted to the State of Missouri, or to the railroad company, by the act of 1852. The latter act contained a reservation from the grant for the railroad of all lands theretofore conveyed or disposed of by the United States. Here then were two grants of the same lands by the United States, these grants operating as effectually as patents to convey title to the property described in them. It became necessary in the suit to ascertain which of these was the superior title. The elder grant *prima facie*, to wit, the grant of the swamp lands to the States, which we have said was a grant *in præsenti*, was the better title. But the question arose as to how it could be shown that this was swamp land within the meaning of the act of 1850, and therefore passed by that statute, and could not afterwards be transferred by the act of 1852.

The act of Congress granting these swamp lands had made it the duty of the Secretary of the Treasury, a duty afterwards transferred to the Secretary of the Interior, to ascertain what were swamp lands, and to make certificate of the fact to the States that were entitled to them. This duty had not been performed by either the Secretary of the Treasury or the Secretary of the Interior. There was no record or documentary evidence, therefore, by which the State claiming those swamp lands, or its grantee claiming under it, could establish the fact that the land which he was occupying was swamp land under the grant of 1850.

The case was brought in a state court of Missouri, and that court permitted Smith to show by parol evidence, the evidence of parties familiar with the land, that it was swamp and overflowed land at the time the grant of 1850 was made by Congress, and had been ever since, and on this testimony a judgment was rendered for the defendant Smith, which was

affirmed by the Supreme Court of the State. From that court it was brought to this court by a writ of error. This court said that " by the second section of the act of 1850, it was made the duty of the Secretary of the Interior to ascertain this fact [namely, whether it was swamp land or not] and furnish the State with the evidence of it. Must the State lose the land, though clearly swamp land, because that officer has neglected to do this ? The right of the State did not depend on his action, but on the act of Congress, and though the States might be embarrassed in the assertion of this right by the delay or failure of the Secretary to ascertain and make out lists of these lands, the right of the States to them could not be defeated by that delay. As that officer had no satisfactory evidence under his control to enable him to make out these lists, as is abundantly shown by the correspondence of the land department with the state officers, he must, if he attempted it, rely, as he did in many cases, on witnesses whose personal knowledge enabled them to report as to the character of the tracts claimed to be swamp and overflowed. Why should not the same kind of testimony, subjected to cross-examination, be competent, when the issue is made in a court of justice, to show that they are swamp and overflowed, and so excluded from the grant under which plaintiff claims; a grant which was also a gratuity ? The matter to be shown is one of observation and examination, and whether arising before the Secretary, whose duty it was primarily to decide it, or before the court, whose duty it became because the Secretary had failed to do it, this was clearly the best evidence to be had, and was sufficient for the purpose."

The subsequent case of *French* v. *Fyan*, 93 U. S. 169, as shown by a careful reading of it, is not in conflict with this decision, because in that case the Secretary having acted upon the matter and certified that the lands then in controversy were swamp and overflowed lands, it was not permitted, in a trial before a jury, to contradict this certificate by oral testimony. And in the still later case of *Wright* v. *Roseberry*, 121 U. S. 488, the principle we are stating is clearly laid down in a case almost identical with the present one.

It is urged upon us, in answer to this view of the subject, that by sections 2325 and 2326 of the Revised Statutes it is made the duty of a person seeking to avail himself of the discovery of a mineral lode and obtain a patent for the same, previous to making the application for a patent, to file the survey and field-notes of the grant which he claims, and do certain other things showing him to be entitled to purchase the mineral land which he claims, all of which is to be under oath. The statute then declares that the register, upon the filing of such application, field-notes, etc., shall publish a notice that such application has been made, for the period of sixty days, in a newspaper to be by him designated as published nearest to said claim, and at the end of this sixty days' publication, "if no adverse claim shall have been filed with the register and the receiver" of the land office, "it shall be assumed that the applicant is entitled to a patent, upon the payment to the proper officer of five dollars per acre, and that no adverse claim exists; and thereafter no objection from third parties to the issuance of a patent shall be heard, except it is shown that the applicant has failed to comply with the terms of this chapter."

Section 2326 then proceeds to enact that where an *adverse claim* is filed it shall be upon oath of the person making the claim, and shall set out the boundaries, nature and extent of such adverse claim, and all proceedings shall be stayed in the land office until the controversy shall be settled or decided by a court of competent jurisdiction. It makes it the duty of the adverse claimant, "within thirty days after filing his claim, to commence proceedings in a court of competent jurisdiction, *to determine the question of the right of possession*, and prosecute the same with reasonable diligence to final judgment; and a failure so to do shall be a waiver of his adverse claim. After such judgment shall have been rendered, the party entitled to the possession of the claim, or any portion thereof," may "file a certified copy of the judgment roll with the register of the land office, together with the certificate of the surveyor general that the requisite amount of labor has been expended or improvements made thereon, and the description required in

other cases, and shall pay to the receiver five dollars per acre for his claim, together with the proper fees, whereupon the whole proceedings and the judgment roll shall be certified by the register to the Commissioner of the General Land Office, and a patent shall issue thereon for the claim, or such portion thereof as applicant shall appear, from the decision of the court, to rightly possess. If it appears from the decision of the court that several parties are entitled to separate and different portions of the claim, each party may pay for his portion of the claim, with the proper fees, and file the certificate and description by the surveyor general, whereupon the register shall certify the proceedings and judgment rolls to the Commissioner of the General Land Office, as in the preceding case, and patents shall issue to the several parties according to their respective rights."

The argument we are considering assumes, as a matter of law, that all that was required of the owners of the Sierra Nevada claim, and all that was required of the register and receiver of the land office in regard to these publications, was done and had, and that, therefore, the owners of the Moyer patent are concluded by the proceedings which are thus supposed to have taken place. There are two substantial objections to this view of the subject. The first is that if such proceedings were had, and resulted either in the trial of the adverse claim before a court of justice, or in the failure of Moyer or anybody else to assert an adverse claim, those proceedings are matters of public record, and as, in this case, they must constitute the main reliance of those claiming under the Sierra Nevada patent, for the superiority of their title, this record should have been produced on the trial of the case; and that the mere opinion of the register and receiver of the land office as to what those proceedings are and their effect upon the prior patent of Moyer, should not be substituted for the production of those proceedings themselves, copies of which were easily obtainable at the land office department.

Another reason, which we think more satisfactory, is, that a careful examination of this statute concerning adverse claims leads us to the conviction that it was not intended to affect a

party who, before the publication first required, had himself gone through all the regular proceedings required to obtain a patent for mineral land from the United States; had established his right to the land claimed by him, and received his patent; and was reposing quietly upon its sufficiency and validity. It is true that there are no very distinctive words declaring what kind of adverse claim is required to be set up as a defence against the party making publication; but throughout the whole of these sections and the original statute from which they are transferred to the Revised Statutes, the words "claim" and "claimant" are used. This word is, in all legislation of Congress on the subject, used in regard to a claim not yet perfected by a title from the government by way of a patent. And the purpose of the statute seems to be, that where there are two claimants to the same mine, neither of whom has yet acquired the title from the government, they shall bring their respective claims to the same property, in the manner prescribed in the statute, before some judicial tribunal located in the neighborhood where the property is, and that the result of this judicial investigation shall govern the action of the officers of the land department in determining which of these *claimants* shall have the patent, the final evidence of title, from the government. This view is consistent with the entire statute on the subject, and some of its language is inconsistent with the idea that any contest to be thus decided is between a party who already has the legal title to the property which he claims and some other party who is only setting up a claim to the same property.

In the first place, its inapplicability to the present case is shown by the requirement that in all cases the successful party shall pay five dollars per acre before he can get his patent. This argues that it has no reference to a placer patent, because for the land conveyed by a placer patent the party is only required to pay two dollars and a half an acre.

Again, the following language seems inconsistent with the idea that one of the contesting parties may already have a patent for the land in controversy, namely: "After such judgment shall have been rendered, the party entitled to the

*possession* of the claim, or any portion thereof, may, without giving further notice, file a certified copy of the judgment roll with the register of the land office, together with the certificate of the surveyor general that the requisite amount of labor has been expended or improvements made thereon, and the description required in other cases, and shall pay to the receiver five dollars per acre for his claim, together with the proper fees, whereupon the whole proceedings and the judgment roll shall be certified by the register to the commissioner of the General Land Office, and a *patent shall issue thereon for the claim*, or such portion thereof as the applicant shall appear, from the decision of the courts to rightly possess. If it appears from the decision of the court that several parties are entitled to separate and different portions of the *claim*, each party may pay for his portion of the claim, . . . and patents shall issue to the several parties according to their respective rights."

It is too obvious to escape comment that by this proceeding there are brought before the court adverse *claimants* to mineral land, and that the party who succeeds in establishing the superior right to the *possession* shall have a patent. This may be the party who institutes the original proceeding or it may be the party who sets up the adverse claim. Whichever of these two establishes his better right to the possession gets the patent. How can this apply to a case where one of the parties already has a patent? How can he be required to pay again for the land for which he has already paid all that the law requires? How can he be required to establish before the land office his right to the possession of a mine for which that office has already granted him a patent?

And again, how can such a case be brought within the terms of a statute which provides, that where "several parties are entitled to separate and different portions of the claim, each party may pay for his portion of the claim, with the proper fees," etc., "and patents shall issue to the several parties according to their respective rights." Why should a patent issue to a party for that for which he already has a patent? These expressions of the statute, so clearly applicable to par-

ties who are only claimants and have no title, show what the purpose of Congress was in passing the law, and that it was not intended that a party who had already gone through all these proceedings and established his right to the mine which he claims, and received his patent for it, shall be put upon the same level with mere claimants, who have yet to establish their claim and prove their right even to the possession, and that he is to be brought before a judicial tribunal to make a contest with a party who has no legal standing in court to contest with him, who has the legal title from the government.

And this is just and is sound policy. Why should a party who has the legal title from the government of the United States, on which he relies with safety, be called upon to answer every adventurer who digs a hole in the ground thus conveyed to him and asserts a right to mineral found in that ground? When he has once obtained the patent of the United States for his land, he should be only required to answer persons who have some established claim, and to contest with this party not before the administrative departments, but in courts of justice, by the regular proceedings which determine finally the rights of parties to property. For these reasons, we do not believe that these sections, 2325 and 2326, are intended to apply to the case of a party who has a prior patent for the land which may be the subject of controversy before the register and receiver of the land office. Is it fair and just that the party who has gone through all the processes which the laws of the United States require of him to obtain title to its lands, and has obtained that title, shall be subjected by the officers of the government of the United States to defend that title before them from the attacks of an outsider?

We have more than once held that when the government has issued and delivered its patent for lands of the United States, the control of the department over the title to such land has ceased, and the only way in which the title can be impeached is by a bill in chancery; and we do not believe that, as a general rule, the man who has obtained a patent from the government can be called to answer in regard to that

·patent before the officers of the land department of the gov-.ernment. *Ex parte Schurz*, 102 U. S. 378.

For these reasons, we are of opinion that. the .Circuit Court in refusing to consider the testimony found in the case, in regard to the known existence of the vein of the Sierra Nevada. ·claim at the time of the application for the Moyer patent, was in error; and, also, that it was erroneous to hold that, on the face of the patent for the Sierra Nevada mine, the existence of this vein and the knowledge of its existence were to be conclu- .sively presumed in this action.

*The judgment is reversed, and the case is remanded to the · Circuit Court, with a direction to grant a new trial.*

·· MR. JUSTICE BREWER, with whom the CHIEF JUSTICE concurred, dissenting:

I am unable to agree with the opinion of the court, delivered ·by MR. JUSTICE MILLER.

A placer patent and the statute under which it is issued ex-, ·pressly provide that it shall not include any known lode or vein. So if, within the limits of placer ground there be a vein .or lode bearing gold or other mineral of precious value, and that vein or lode was known at the time of the·application for the placer patent, it did not pass under the patent. It was as ·much excepted from its terms as though it were in an adjoining State. It was territory carved out by the very language of the patent and the statute, and not passing to the patentee, remained the property of the government, and subject to location and patent, as fully and in the same manner and upon the same terms as any other mineral vein. Suppose a patent for agricultural lands by virtue of the statute excepted all lakes, ponds and other bodies of water, who would .doubt that the title to any lake or pond, within the territory described in such patent, remained in the government and subject to sale by it in any manner it deemed best; or that a title thereto obtained, in the manner prescribed by law, was paramount? · So here. There is only one way and one tribunal provided for obtaining

title to any vein or lode, whether within or without the limits of placer ground, and that is by application in the land office. That way was pursued in this case, and a patent obtained. Whether this lode or vein was or was not within the limits of the placer patent depends upon no matter of law, but upon two questions of fact: first, Was there a vein bearing gold or other precious mineral within the limits of the placer territory? and, second, Was it known at the time of the application for the placer patent? These two questions of fact determine the question whether the placer patent took the whole surface ground, and all veins and lodes within its territory. Provision is made by statute for putting such questions of fact in issue. The adverse proceedings prescribed by statute are of common occurrence. It is the ordinary procedure. We have had cases involving such procedure before us this term. But I fear that this decision is equivalent to holding that such statutory adverse proceedings amount to nothing and are unworthy of notice. From *Johnson* v. *Towsley*, 13 Wall. 72, to the present time, the uniform ruling of this court has been, that questions of fact passed upon by the land department are conclusively determined, and that only questions of law can be brought into court.

The right to this patent depends solely upon these two questions of fact, which were considered by the land office when the original patent was issued. I think that its determination upon them was conclusive.

I am authorized by the CHIEF JUSTICE to say that he concurs in these views.